Argued and submitted January 26; resubmitted
in banc September 2, affirmed September 8,
reconsideration denied November 5,
petition for review allowed December 2, 1981 (292 Or 108)

STATE OF OREGON,
*Respondent,*

*v.*

DALE LAVONNE BROCK,
*Appellant.*

(No. 35639, CA 17453)

633 P2d 805

John S. Ransom, Portland, argued the cause for appellant. With him on the brief was Ransom, Rogers & Blackman, Portland.

Rudolph Westerband, Assistant Attorney General, Salem, argued the cause for respondent. On the brief were James M. Brown, Attorney General, John R. McCulloch, Jr., Solicitor General, William F. Gary, Deputy Solicitor General, and Robert C. Cannon, Assistant Attorney General, Salem.

RICHARDSON, J.

BUTTLER, J., specially concurring opinion.

GILLETTE, J., dissenting opinion.

## RICHARDSON, J.

Defendant appeals from a judgment of conviction for theft in the first degree (ORS 164.055) entered following a jury verdict. He assigns as error the trial court's denial of his motion for judgment of acquittal on grounds of insufficient evidence, the failure of the court to give certain requested instructions and the denial of his motion to suppress evidence seized in a nighttime search of his residence pursuant to a warrant. Additionally, he claims that the cumulative effect of certain alleged prosecutorial misconduct during the trial resulted in a denial of his due process rights. We affirm.

In material part, the indictment alleged that the defendant

"* * * did unlawfully and knowingly commit theft of one (1) General Electric brand washer, one (1) General Electric brand dryer, one (1) General Electric brand refrigerator, one (1) carpet marked 'Golden West,' and one (1) full length mirror of the total value of more than Two Hundred Dollars ($200.00), by withholding said property from Barrett Mobile Home Transport, Inc., the owner thereof, * * *."

The victim, Barrett Mobile Home Transport, Inc. (Barrett), maintained a lot for storage of fully equipped mobile homes which were awaiting transport. An employee of Barrett testified that from December, 1978, through February, 1979, several of the mobile homes were broken into and numerous items removed. The stolen items included several General Electric refrigerators varying in size from 14.2 to 16.5 cubic feet with a replacement cost of approximately $450 each. A General Electric washer and dryer in their original cartons were taken and had a replacement cost of $300 each. Also taken was a large roll of special order carpet marked "Golden West" and containing an individual run number, and two full length mirrors with a replacement cost of $75 each.

Dale Morford, a witness for the state under a grant of immunity, testified that he and defendant broke into mobile homes stored on the Barrett lot on several occasions during the December to February period. On one occasion they removed a General Electric refrigerator. In the process of loading the refrigerator in defendant's van it was

damaged with a crease down one side. On other occasions they removed a General Electric washer and a dryer still in the original cartons, a large roll of carpet and two full length mirrors. The refrigerator, washer and dryer and one of the mirrors were taken to defendant's residence where they were installed for use. A portion of the large carpet roll was cut and installed in a bedroom there. Morford testified he had been in defendant's home a number of times following the thefts and had observed the items in use there. He identified the items after they were removed from defendant's home by the police, pursuant to the warrant, as those taken from the mobile homes and used in defendant's residence.

Defendant was arrested pursuant to an arrest warrant at approximately 9 p.m. on June 29, 1979. On that same day a police officer submitted an affidavit for a search warrant to search his residence. It was executed shortly after 10 p.m. on June 29, 1979. The police seized a 14.2 cubic foot General Electric refrigerator with a crease on one side, a General Electric washer and dryer, a piece of carpet and one full length mirror.

Defendant's first assignment contends that his motion for judgment of acquittal should have been granted. His principal contention under this assignment is that there was not sufficient evidence identifying the items seized in defendant's home as the property stolen from Barrett. His first argument is that there was no evidence that the serial numbers on the appliances in defendant's home matched serial numbers of appliances stolen from the mobile homes. The state did not produce serial numbers of the stolen appliances. He cites *State v. Oster,* 232 Or 396, 376 P2d 87 (1962), and contends the serial numbers are the best evidence of identification and the failure of the state to identify the appliances by serial numbers is fatal.

In *Oster,* the defendant was charged in Marion County with receiving and concealing check blanks stolen from the Pepsi Cola Bottling Company in Multnomah County. An accomplice testified that she observed defendant and certain other individuals hide a purse under a log in Marion County. The witness later led the police to the hidden purse. A police officer testified the purse contained

Pepsi Cola Bottling Company check blanks. The checks were not further identified nor were they offered in evidence. The court held the evidence was insufficient to identify the checks in the purse as those stolen from the bottling company. The court noted that the evidence showed that each of the checks stolen bore the name and address of the company and a serial number and said that if the checks in the purse were among the checks reported stolen that fact would have appeared from a comparison of the serial numbers. It concluded:

> "* * *That rule [the rule in larceny cases] is that identification of property found in the possession of the accused as that stolen in the theft with which he is charged must be by the most direct and positive testimony of which the case is susceptible * * *." (Citations omitted.) 232 Or at 403.

■ ■ We do not read *Oster* as saying as a matter of law that if serial numbers are arguably available identification by comparison of serial numbers is the only proof which will be sufficient. The inquiry is whether the evidence viewed in a light most favorable to the state is sufficient for the jury to find beyond a reasonable doubt that the items in defendant's possession were stolen from the named victim. In the case under review, Morford positively identified the appliances taken from defendant's residence as those he and defendant had stolen from Barrett. We conclude there was sufficient evidence.

Defendant's second argument under this assignment is that if serial number identification was not required, there was still insufficient evidence to establish that the appliances were stolen from Barrett. He contends the Barrett employee was unable to identify the property seized from defendant's residence as that taken from the mobile homes. The witness was only able to identify the appliances as of the same brand and color taken from the mobile homes. However, the testimony of that witness in conjunction with the testimony of Morford was sufficient to identify the seized property as that stolen from Barrett.

Our conclusion that the evidence sufficiently identified the appliances disposes of defendant's final argument in support of his motion that, absent the appliances, the remaining property was not valued in excess of $200 as

required to sustain a conviction for theft in the first degree.

◾  Defendant's second assignment of error is that the court improperly declined to give two of his requested instructions. In substance, the two instructions were to the effect that if the state offers weaker and less satisfactory evidence when more satisfactory evidence is available, the evidence offered should be viewed with suspicion. The requested instructions, when read together, limited application of the principle to evidence submitted by the state. The instructions are based on ORS 17.250(7), which requires the jury to be instructed on all proper occasions:

"That if weaker and less satisfactory evidence is offered when it appears that stronger and more satisfactory was within the power of the party, the evidence offered should be viewed with distrust."

The court declined to give the instructions because defendant did not testify, the instructions would not apply to him, and it would not give instructions that did not apply to both parties. An instruction pursuant to ORS 17.250(7) should be avoided in a criminal case unless limited to evidence offered by the state. *State v. Holleman,* 225 Or 7, 357 P2d 264 (1960). When a defendant in a criminal case requests such an instruction, it ought to be given if otherwise appropriate. To be appropriate, there must be evidence to support the instruction. If there is no basis in the record to conclude the state had evidence not produced which was arguably stronger than the proof offered, then it is not error to refuse the instruction. *State v. Harwood,* 45 Or App 931, 609 P2d 1312, *rev den* 289 Or 337 (1980); *State v. Gwyther,* 4 Or App 473, 479 P2d 248, *rev den* (1971).

◾  Defendant argues that the instructions were justified because of the state's failure to produce a record of the serial numbers on the appliances stolen from the mobile homes for comparison with the numbers on the appliances seized from defendant's residence. He argues there was evidence that the serial number record was available to the state and would have been more satisfactory proof that the appliances were stolen. In order for the serial numbers to be relevant, they would have to be numbers on appliances taken from the mobile home. The

Barrett employee testified that Barrett did not have a record of the serial numbers of appliances in the mobile homes on its lot. He stated that the mobile homes were delivered to Barrett completely furnished with appliances and the delivery documents did not contain serial numbers of the appliances. Consequently, evidence respecting any serial numbers was not available for the state to produce.

Defendant's conclusion that a record of the numbers was available was based on his assumption that all appliances have serial numbers and there exists somewhere a record of those numbers. The state, he contends, could have obtained this record. We decline to hold that just because the state possibly could have by a more diligent investigation obtained the record from either the appliance manufacturer or the mobile home manufacturer, the evidence is within the power of the state to produce, as that phrase is used in ORS 17.250(7) and the instructions. We conclude the instructions were not appropriate, because there was not a sufficient basis in the evidence to support them.

In his third assignment, defendant contends his motion to suppress the evidence seized pursuant to the warrant should have been granted because the endorsement for a nighttime search was improperly given by the issuing judge.

The warrant was issued at 9:36 p.m. and provided on its face, by way of a preprinted form authorization, that it could be executed "at any time of the day or night." The issuing judge signed the warrant twice, his second signature specifically endorsing the provision for execution at any time. The police executed the warrant shortly after 10 p.m. Defendant argues that the search at night was unauthorized and contrary to law because the judge, in allowing execution of the warrant at any time, failed to make any findings as to the necessity for a nighttime search and because the facts in this case do not reveal any justification or need for a search at night.

ORS 133.565(3) provides:

"Except as otherwise provided herein, [a] search warrant shall be executed between the hours of 7 a.m. and 10 p.m. and within five days from the date of issuance. *The*

*judge issuing the warrant may, however, by endorsement upon the face of the warrant, authorize its execution at any time of the day or night* and may further authorize its execution after five days, but not more than 10 days from date of issuance." (Emphasis supplied.)

It is the emphasized portion of the statute which is the subject of this assignment of error. The statute says the judge "may" endorse the warrant but does not say under what circumstances nighttime service may be allowed. The answer to that question is not clear from the face of the statute, and we must turn to the legislative history for assistance.

ORS 133.565(3) was enacted as part of the Criminal Code revision. Oregon Laws 1973, ch 836, § 85. Before its enactment, a search warrant could be executed at any time without specific authorization by the issuing judge. *See State v. Kook,* 14 Or App 594, 513 P2d 1189, *rev den* (1973). The official commentary to ORS 133.565 recognizes that the new statute is a modification of Oregon Law:

"Subsection (3) contains an important innovation for Oregon Law. Where possible searches should be conducted in daylight hours, the invasion of private premises in the small hours of the night smacks of totalitarian methods and is more likely to create the terror that precipitates gun battles. Obviously there are occasions when it is imperative that the search be conducted at night. Subsection (3) permits such searches if the judge so authorizes service on the face of the warrant in the nighttime hours after 10 p.m." Criminal Law Revision Commission Proposed Criminal Code, Final Draft, 75 Commentary to § 135.

In construing the statute before us, our function is to ascertain and apply the intent of the legislature. *Fifth Avenue Corp. v. Washington Co.,* 282 Or 591, 581 P2d 50 (1978); *Salahub v. Montgomery Ward,* 41 Or App 775, 599 P2d 1210, *rev den* 288 Or 249 (1979). "In this endeavor, we may give due consideration to legislative history." *State v. Leathers,* 271 Or 236, 242, 531 P2d 901 (1975). ORS 133.565(3) by its terms indicates that daytime searches are to be the rule, and searches at night are to be the exception. The question is when the exception applies.

In the commentary quoted above, the legislature, insofar as it accepted the commentary of the Law Revision

Commission, recognized that nighttime searches are a greater intrusion upon an individual's privacy and are more likely, when compared to searches conducted during the daytime, to be met with armed resistance. Thus, the practice of executing warrants at night is to be limited. Warrants allowing for execution at any time, day or night, must be specifically authorized by the issuing judge. It follows, from the language used by the drafters of the statute, that circumstances claimed to demonstrate the necessity for a nighttime search must be presented to the judge by the applicant. The judge must then decide if the circumstances, as presented, justify a search at any time. Unless the judge concludes they do, execution of the warrant must be limited to the daytime hours specified in the statute.

■ If the statute were read literally, as the state would have us do, a warrant could be executed at night merely upon the judge's authorization and without any showing of a need for the greater intrusion. A judge might authorize a night search simply because there was no reason not to or because the application for a warrant had been presented. Subsection (3) would become meaningless if we were to make that interpretation. The limitation would be one of form only, rather than one of substance, and the 1973 addition to the Criminal Code would have made no substantive change in existing law. It would certainly not have been an "important innovation." Legislation should be interpreted to carry out its legislative purpose. The necessity of a showing by the applicant of special circumstances before a nighttime search may be authorized is inherent in the statute.

■ ■ We hold that a judge issuing a search warrant allowing execution at any time, day or night, may do so only on the basis of facts presented to him during the warrant application process which demonstrate the necessity of a nighttime search. When the police obtain a constitutionally valid warrant they ought to be allowed to search at a time when there are reasonable prospects of a safe and successful search. There may be circumstances that would reasonably lead to a conclusion that a search can only be safely or successfully conducted at night; or the circumstances of the contemplated search may be difficult

to predict with accuracy and a nighttime search would be justified to insure a reasonably successful search. The decision must be made in light of the legislative policy favoring daytime searches.

■ The record in this case does not disclose special circumstances justifying a nighttime search. The state argues the facts that the warrant was issued at 9:36 p.m., just 24 minutes before the 10 p.m. deadline, that defendant was in custody and that the police were unaware his girlfriend resided in the house to be searched is a sufficient basis for the endorsement. These facts do not support a conclusion that a nighttime search was reasonably necessary to insure a safe or successful search. The application sought a warrant to search for and seize large household appliances. It is unlikely those appliances would be surreptitiously removed before the search could be conducted the next morning. The fact the warrant was issued only minutes before 10 p.m. is not in and of itself a basis for a nighttime search. As a matter of convenience, it may have been desirable for the police to conduct the search immediately; however, mere convenience of the police is not a sufficient basis in light of the legislative policy that nighttime searches be limited.

■ Having determined that there was not a sufficient factual basis for the endorsement allowing execution of the warrant any time of the day or night, we turn to the question of whether the property seized pursuant to the warrant should have been suppressed. The Oregon Supreme Court has generally held that evidence seized in violation of a state criminal statute will only be suppressed when the violation rises to the level of a federal constitutional violation. *See, e.g., State v. Bishop,* 288 Or 349, 605 P2d 642 (1980); *State v. Valentine/Darroch,* 264 Or 54, 504 P2d 84 (1972), *cert den* 412 US 948 (1973); *State v. Valdez,* 277 Or 621, 561 P2d 1006 (1977).

The genesis of the rule limiting nighttime searches is purely statutory. In *State v. Kook, supra,* we held there was no constitutional requirement that a search warrant be executed during any particular time of the day or night. ORS 133.565 was enacted as a modification of Oregon statutory law—not constitutional law. Legislation may reflect constitutional principles, *e.g., State v. Valdez, supra,*

or impose statutory restrictions on searches, but it does not create constitutional law or doctrine. The concept that the nighttime search limitation is part of the constitutionally reasonable search construct has been specifically rejected by a number of courts. *See State v. Kook, supra; United States v. Searp,* 586 F2d 1117 (6th Cir 1978), *cert den* 440 US 921 (1979); *United States v. Burke,* 517 F2d 377 (2nd Cir 1975); *United States v. Dauphinee,* 538 F2d 1 (1st Cir 1976); *United States v. Ravich,* 421 F2d 1196 (2nd Cir), *cert den* 400 US 834 (1970).

The opinion in *United States v. Searp, supra,* is instructive, because it discusses in detail the method of dealing with evidence seized in a nighttime search which was not properly authorized. In that case defendant was convicted in a federal court of bank robbery. He moved for suppression of evidence seized pursuant to a warrant from his mother's residence at night on the basis that a nighttime search was not authorized. State and federal officers jointly conducted an investigation of the bank robbery. They obtained a warrant for defendant's arrest and went to his mother's residence to arrest defendant who resided there. He had fled the state, and his mother refused to allow a search of the residence. The local police and the federal authorities immediately obtained a search warrant from a state court based on the affidavit of an FBI agent. The warrant was issued at 11:27 p.m. and was executed later that night by local police and federal officers. No state statute or regulation restricted the execution of a search warrant to any particular time period nor required an endorsement for nighttime service.

The court first held that, because of the participation of the federal agents in obtaining and executing the warrant, the validity of the search was to be judged by federal law, including the Federal Rules of Criminal Procedure. Rule 41(c)(1), Fed. R. Crim. P., provided that a search warrant "shall be served in the daytime, unless the issuing authority, by appropriate provision in the warrant, and for reasonable cause shown, authorizes its execution at times other than daytime." The court concluded the warrant did not comply with Rule 41 because it contained no specific authorization for a nighttime search, and there were no

particular facts presented to the issuing judge showing a need for a nighttime search.

The court, however, concluded the evidence seized was admissible. After discussing the basis of the rule for daytime searches, it said:

> "Nevertheless, the particular procedures mandated before a night search may be conducted are not part of the fourth amendment, and we conclude that suppression should not automatically result from any violation of the rules. A further inquiry into the actual search which occurred is permissible." 586 F2d at 1124.

The court explained that the portion of Rule 41 under review was not a reflection of constitutional rights but was designed to govern the conduct of law enforcement agents as a safeguard against abusive, arbitrary police action in carrying out a constitutionally authorized search. The court discussed the propriety of excluding evidence seized at night without proper authorization in terms of the harmless error rule and said:

> "When there has merely been a violation of the procedural rules governing night searches, suppression, with its attendant potential for a miscarriage of justice, is not justified when there was neither a possibility of bad faith conduct on the part of the police, nor prejudice to the defendant (in the sense that the search might not have occurred or would not have been so abusive if the requirements of the Rule had been observed). The test is met, and suppression would be required when, based on the facts and circumstances known to the police at the time application was made for the warrant, there is a reasonable possibility that permission for a night search would have been refused even if an appropriate request had been made." 586 F2d at 1125.

In upholding admission of the evidence, the court noted that defendant's mother was the only person in the residence when the warrant was executed and that she earlier was told the police would return with a search warrant. The court said the protection against surprise searches given by Rule 41 was not necessary, because the occupant of the house was aware a search was imminent. The court also noted that defendant had already fled, so his interests were not violated by failure to adhere to the rule controlling nighttime searches.

The analysis and rationale of *United States v. Searp, supra,* is appropriate here. Defendant was in custody and his statutorily mandated interest to have a daytime search of his residence, and thereby to avoid a more obtrusive nighttime search, was obviated. The police had a warrant which was constitutionally valid and which on its face contained an endorsement for nighttime service. The police were unaware that the defendant's girlfriend also lived in the residence and reasonably assumed there would be no one present when the search was made. There was no prejudice to the defendant and no bad faith on the part of the police in conducting the search at the time they did.

The dissent argues that the statutory rule limiting nighttime searches is analogous to the "knock and announce" rule (ORS 133.575(2)), which has been enforced by application of the constitutionally based, judicially announced exclusionary rule. *See State v. Valentine/Darroch, supra.* The basis of the knock and announce rule is the supposition that an announcement that the persons seeking entry are police and are there to search will lessen the terror citizens might feel from persons entering their homes and thereby reduce the chance the entry will be met with forcible resistance. In some measure the statutory nighttime search limitation has the same conceptual basis. Although the two rules have similar bases, we need not carry the analogy to the point of engrafting the mechanism for enforcement of the knock and announce rule as the enforcement mechanism for the nighttime search limitation. If the knock and announce rule is adhered to by the police, the legislative policy embodied in ORS 133.565(3) of guarding against surprise searches which may be met with force is fostered. There is no assertion in this case that the police did not announce their presence and purpose before entering defendant's residence. As the Supreme Court said in *State v. Quinn,* 290 Or 383, 623 P2d 630 (1981):

> "* * *The device of excluding trustworthy evidence from the factfinding process in order to serve higher purposes 'is a needed, but grudgingly taken medicament; no more should be swallowed than is needed to combat the disease.* * *" 290 Or at 397.

We conclude that it is unncecesary to apply the exclusionary rule in this case and that the court did not error in denying defendant's motion to suppress the evidence.

In his final assignment of error defendant contends "[t]he cumulative effect of the prosecutorial misconduct in this case resulted in a denial of the defendant's due process rights." Defendant identified three instances which he alleges involved prosecutorial misconduct. The first involved the employee of Barrett who testified for the state. During his opening statement defendant suggested that the witness would be unable to identify the property stolen from the mobile homes and that his testimony would be at variance with the description of the property given to the police. Following the opening statements the prosecutor took the witness to the police property room and had him view the property taken from defendant's residence. On the witness stand the employee identified the property in custody of the police as having been stolen from the mobile homes. He explained the discrepancies between his discription on the witness stand and that given to the police at the time the theft was reported. Defendant moved for dismissal on the ground the prosecutor's conduct allowed the witness to alter his testimony to take care of the variances defendant suggested in his opening statement. On cross-examination of the witness, defendant brought out the fact the witness had been shown the property during the recess.

The court denied defendant's motion for dismissal, stating that it was not inappropriate for the prosecutor to discuss with a witness the testimony he would give from the witness stand. We agree. There is nothing in the record to indicate the prosecutor told the witness what to say. The prosecutor told the court he had merely shown the property to the witness and had neither told him what to say nor discussed defendant's opening statement. This was confirmed by the witness before the jury. The prosecutor's conduct was brought out in front of the jury and could be utilized by the jury in judging the weight of the testimony.

The second instance of alleged misconduct involved another witness, the defendant's girlfriend. She had been subpoenaed by the state, but the state elected not to call her as a witness. Defendant decided to call her as his witness. While she was waiting in the hall outside the courtroom, she was served with a subpoena for appearance before the grand jury the following day. During a recess she informed defendant's counsel she would not testify because of the grand jury subpoena.

Defendant moved for dismissal of the indictment on the ground the service of the grand jury subpoena prevented him from calling a witness. The prosecutor explained that the grand jury proceedings did not involve anything connected with the trial. He stated the police had previously been unable to serve the grand jury subpoena and did so when the witness appeared for the trial as a matter of convenience. He also explained that, because the witness travelled some distance to the courthouse her appearance before the grand jury the following day would make it unnecessary for her to make a separate trip. The court explained the situation to the witness, told her of any rights she would have not to incriminate herself and allowed her an opportunity to consult with an attorney. Following a recess, the witness told the court she decided not to consult with an attorney and would testify for defendant. The record indicates she understood and was satisfied with the explanation given by the court. There is no indication her testimony was in any way affected by the incident.

The third incident of alleged misconduct involved a question of discovery. After the indictment was returned and prior to the first setting of the trial, the prosecutor had told defendant's counsel that the property seized from defendant's residence had been returned to the owners and was not available for his inspection. During the hearing on defendant's motion to suppress, which was held at the time the trial was originally set, the prosecutor revealed that during the previous week he had discovered the property was in the police property room. Defendant asserted that this was a violation of the discovery statute and moved for a continuance. Following the hearing on the motion to suppress, the court granted a continuance to allow defendant to inspect the property. Although there may have been a violation of the discovery statute, any prejudice to defendant was cured by granting his request for a continuance.

We conclude these three instances did not deprive defendant of a fair trial.

Affirmed.

**BUTTLER, J.,** specially concurring.

Because I would affirm the judgment, I concur in the result reached by the majority opinion; however, I disagree with its rewriting of ORS 133.565(3) relating to the execution of the search warrant after 10 p.m.

The separation of powers mandated by our constitution, Or Const, Art III, § 1,[1] appears to be ignored, or overlooked, by judges more and more frequently. Perhaps judges think they can legislate as well as the legislators, but even if that be true, ability does not equal authority. Neither does the raw power to do so make it right. To the contrary, it emphasizes the need for judicial restraint, because even legislation duly enacted by the legislative assembly is subject to veto by the governor; judicial legislation is not.[2]

Aside from the constitutional mandate against our rewriting statutes, there are practical considerations militating against it. A court hears only the parties to a given dispute before it; the legislature is a forum for any and all interested parties. The legislative result is typically an accommodation of those interests, a compromise of the views expressed in the open forum; a judicial determination is not.

When judges go off on their own inclinations, we cease to have a government of laws—each judge is free to rewrite a statute in his or her own image. That is a dangerous process to tolerate; unfortunately, it is only when one disagrees with the result a given opinion reaches by rewriting a statute that one becomes annoyed—an

---

[1] Or Const., Art III, § 1 provides:

"The powers of the Government shall be divided into three seperate [*sic*] departments, the Legislative, the Executive, including the administrative, and the Judicial; and no person charged with official duties under one of these departments, shall exercise any of the functions of another, except as in this Constitution expressly provided."

Or Const., Art IV, § 1(1) provides:

"(1) The legislative power of the state, except for the initiative and referendum powers reserved to the people, is vested in a Legislative Assembly, consisting of a Senate and a House of Representatives."

[2] Of course, the Supreme Court has an analogous power over decisions of this court, but there is nothing to stem the exercise of power by that court other than the legislature's authority to enact new legislation to undo what the court has done.

intellectual application of the pain and pleasure theory. Historically, rules have evolved, largely of judicial origin, designed to avoid a court's invasion of the legislative domain. They are called, appropriately, rules of statutory construction, and, when properly applied, have the effect of limiting a particular judge's inclination to do what he thinks the legislature should have done. They make the judicial function more objective and less subjective.

The keystone of those rules is that if a statute is clear and unambiguous, courts must apply it as written without resort to extrinsic evidence to give it a different meaning. A statutory recognition of this general rule is contained in ORS 174.010:

> "In the construction of a statute, the office of the judge is simply to ascertain and declare what is, in terms or in substance, contained therein, not to insert what has been omitted, or to omit what has been inserted; and where there are several provisions or particulars such construction is, if possible, to be adopted as will give effect to all."

Very recently, the Supreme Court in *Whipple v. Howser*, 291 Or 475, 632 P2d 782 (1981), emphasized the importance of that fundamental rule. The court pointed out that the starting point in every case is the language of the statute; it went on to state:

> "More specifically, in *State ex rel Cox v. Wilson*, 277 Or 747, 562 P2d 172 (1977), we held (at 750) that:
>
> "'"There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes."' Quoting *United States v. American Trucker's Ass'ns*, 310 US 534, 542-44, 60 S Ct 1059, 84 L Ed 1345 (1940)."
>
> "As also held in *Lane County v. Heintz Const. Co. et al*, 228 Or 152, 157, 364 P2d 627 (1960), quoting with approval from *Barrett v. Union Bridge Co.*, 117 Or 566, 570, 245 P 308, 45 ALR 527 (1926):
>
> "'Section 715, Or. L. [now ORS 174.010], directs that the courts in the construction of statutes, are "simply to ascertain and declare what is in terms or in substance contained therein, *not to insert what has been omitted, nor to omit what has been inserted.*" We ought never to import into a statute words which are not to be found there, unless from a careful consideration of the entire statute it be ascertained that to import such words is necessary to give*

> *effect to the obvious and plain intention and meaning of the*
> *legislature. Under the directions of the statute last referred*
> *to,* we are not at liberty to give effect to any supposed
> intention or meaning in the legislature, unless the words
> to be imported into the statute are, in substance at least,
> contained in it.'" (Emphasis in original.)

It is not the proper function of the court "to make its own
policy judgments * * *." 291 Or at 480. Not infrequently the
meaning of a statute is not clear; but even then we are not
free to give it the meaning we prefer—many rules of
construction come into play to assure that judges do not
usurp the legislative function. Those rules help to assure
the integrity of the constitutional separation of powers.
Notwithstanding the function of those rules, they are not a
precise method of attempting to ascertain legislative in-
tent, and resort to them ought to be avoided unless the
language of the statute itself requires extrinsic aids. *See
Whipple v. Howser, supra,* 291 Or at 483.

The statute involved here makes the point. It
would be difficult to make it more clear or less ambiguous.
ORS 133.565(3) provides:

> "(3)   Except as otherwise provided herein, the search
> warrant shall be executed between the hours of 7 a.m. and
> 10 p.m. and within five days from the date of issuance. The
> judge issuing the warrant may, however, *by indorsement
> upon the face of the warrant,* authorize its execution at any
> time of the day or night and may further authorize its
> execution after five days, but not more than 10 days from
> date of issuance." (Emphasis supplied.)

Prior to the Criminal Code Revision, of which the quoted
section is a part, a search warrant could be executed during
either the daytime or nighttime. As revised, the statute
requires the warrant to be executed between the hours of 7
a.m. and 10 p.m. *unless* the judge issuing the warrant, *by
indorsement upon the face of the warrant,* authorizes execu-
tion at any time of the day or night. That is all that the
statute requires, and that was done in this case.

Both the United States and Oregon constitutions[3]
require only that there be probable cause shown to the

---

[3] Fourth Amendment to the United States Constitution; Oregon Constitution,
Article I, section 9.

issuing magistrate prior to the issuance of the warrant; it does not require that the warrant be executed prior to 10 p.m. The legislature, of course, may make the requirements more stringent than constitutionally required, and has done so here to the extent that the statute requires the issuing magistrate to indorse upon the face of the warrant authority to execute the warrant after 10 p.m.

Because the statute is clear and unambiguous, there is no occasion to look to extrinsic evidence or aids in construction, including the legislative history, to resolve an ambiguity; there is none. The majority attempt to force an ambiguity by stating that the statute does not say under what circumstances a warrant may be executed after 10 p.m. But it does: when the issuing magistrate makes the required indorsement on the face of the warrant. It ought to at least occur to us that the legislature meant exactly what it said.

Even if we indulge the majority's (and the dissent's) compulsion to seek the legislature's "true intent" by reviewing the legislative history, that review does not support either opinion's view of what the legislature intended. In fact, it demonstrates rather vividly that the Criminal Law Revision Commission's preliminary draft of this subsection specifically required a special finding by the judge justifying a nighttime search. That draft read as follows:

"(3)  *Time of execution.* Except upon finding as hereinafter provided, the search warrant shall provide that it be executed during the daytime, and within five days from the date of issuance. Upon a finding by the judge of probable cause to believe that the place to be searched is not readily accessible, or that the objects to be seized are in danger of imminent removal, or that the warrant can only be safely or successfully executed at nighttime, or under circumstances the occurrence of which is difficult to predict with accuracy, the judge may, by appropriate provision in the warrant, authorize its execution at other times but not more than 10 days from the date of issuance."

*See* Criminal Law Revision Commission 1969, Preliminary Draft No. 3, § 6. The original bill as introduced in the Senate did not contain the requirement of a specific finding. That language of the bill is the same as the enacted statute. *See* Or Laws 1973, ch 836, § 85.

It is true that there is no indication why the Commission changed the proposed wording, and thus the requirements, of the statute. The fact is, however, that it *did* change it to eliminate the requirement of making a record stating the reasons for authorizing a search after 10 p.m. Accordingly, if anything is be gleaned from the legislative history, which I do not believe to be a proper inquiry here, it is that requirements along the line of either the majority or the dissent were specifically rejected, albeit we do not know for what reason.

The majority contends that ORS 133.565(3) would be meaningless if we applied the statute as written. That is an overstatment: the issuing magistrate must specifically authorize a search after 10 p.m., which authorization was not necessary before the revised code was adopted. That may not be much, but it is all the legislature required and is more than was required before the amendment. The majority also state that the statutory limitation would be one of form only, rather than of substance, if applied as written. Accordingly, they say, the statute means that the magistrate may authorize a search after 10 p.m. "only on the basis of facts presented to him during the warrant application process which demonstrate the necessity of a nighttime search." 53 Or App at 793. They go on to conclude that there were no such facts presented here,[4] and therefore the search was invalid.

That conclusion *sounds* like substance. But the majority's bottom line is, "So what?"—the evidence is admissible notwithstanding the invalidity of the search and seizure. Some substance!

If I felt the need, or that we had the authority, to rewrite the statute, I would vote for an amendment which would require a sworn, written pre-authorization record. I think that amendment would make a better statute, albeit a different one, from what the legislature clearly provided.[5]

---

[4] It is not clear how the majority would review the pre-warrant justification for the nighttime search, because they do not appear to require a record of the basis for a request. Presumably, an *ex post facto* determination would be permissible, depending on what facts the state may adduce after the fact to justify the special authority.

[5] I could probably be persuaded to go along with the Criminal Law Revision Commission's proposed draft, quoted earlier, depending on what the interested

I would hold that the statute means exactly what it clearly says: it is sufficient to authorize the warrant's execution after 10 p.m. if the warrant contains on its face the indorsement of the issuing magistrate authorizing the nighttime search. Therefore, I would affirm.

Warden, J., and Van Hoomissen, J., join in this opinion.

**GILLETTE, J.,** dissenting.

The issue in this case which is of transcendental importance is the issue of the nighttime search.

The majority holds, correctly, that a showing of some kind of special circumstances justifying a search in the nighttime before such a search may be authorized "is inherent in the statute." 53 Or App at 793. The majority then says, equally correctly, that "[t]he record in this case does not disclose special circumstances justifying a nighttime search." 53 Or App at 794. However, the majority then goes on, in the face of this demonstrated violation of statutory directive and purpose, to hold that nothing can be done about it.

Nothing can be done about it, the majority holds, because the only sanction that would matter—exclusion of the evidence seized—is, in its view, inappropriate. I most strongly disagree.

The problem of sanction is an eternal puzzle. Where the improper conduct of the state is directly connected with the seizure of evidence in a criminal case, the obvious sanction is suppression. Suppression, however, is a harsh remedy, and one which should not be resorted to in any save those cases in which its use is clearly necessary to further a significant public policy. *See State v. Quinn,* 290 Or 383, 397, 623 P2d 630 (1981).

The Oregon Supreme Court has generally held that evidence seized in violation of a state criminal statute will only be suppressed when the violation rises to the level of a federal constitutional violation. *See, e.g., State v. Bishop,*

parties had to say during hearings in the House, if I were a Representative, or in the Senate, if I were a Senator. As Governor, I would not veto either proposal, if enacted.

288 Or 349, 605 P2d 642 (1980); *State v. Valentine/Darroch,* 264 Or 54, 504 P2d 84 (1973), *cert den* 412 US 948 (1973). This rule was developed and has been consistently applied in cases where the police have failed to comply fully with the "knock and announce" statute before entering premises to execute a search warrant. A review of the analysis used in connection with the "knock and announce" statute is instructive here.

The purposes of the "knock and announce" rule are said to be

"* * * (1) to protect persons who might be injured by violent resistance to unannounced entries by law enforcement officers, and (2) to protect the householder's right to privacy. * * *" *State v. Valentine/Darroch, supra,* 264 Or at 60.

*See also, State v. Bishop, supra; State v. Miller,* 43 Or App 421, 602 P2d 1141 (1979). In "knock and announce" cases, the court has ordered that evidence be suppressed only when the method of entry violated both purposes of the knock and announce rule, causing the statutory violation to rise to the level of a constitutional violation. *See State v. Bishop, supra.*

ORS 135.565(3) has a dual purpose parallel to that of the knock and announce statute:

1. The legislature has recognized that a search at night is a greater intrusion upon an individual's right to privacy than one conducted during daylight hours. The United States Supreme Court has found nighttime searches to be peculiarly offensive.

"[I]t is difficult to imagine a more severe invasion of privacy then (a) nighttime intrusion into a private home." *Jones v. United States,* 357 US 493, 498, 78 S Ct 1253, 2 L Ed 2d 1514 (1958).

Thus, while the provision limiting nighttime searches is not in and of itself of constitutional stature, it nevertheless furthers the fundamental purposes of the Fourth Amendment. *See United States v. Searp,* 586 F2d 1117, 1124 (6th Cir 1978), *cert den* 440 US 921 (1979).

2. As the majority acknowledges, the Commission which proposed the language which became ORS

133.565(3) also recognized that night searches are "more likely to create the terror that precipitates gun battles." Thus, the statute before us, like the knock and announce rule, seeks to protect persons who might be injured as a consequence of violent resistance to searches initiated during the nighttime hours. *See State v. Callaghan*, 33 Or App 49, 576 P2d 14 (1978), *rev den* 284 Or 1 (1978).

In view of the fact that the statute before us is an elaboration upon and is in furtherance of recognized constitutional principles, and further in view of the fact that it does not impose a mere technical requirement or ministerial duty, I conclude that the sanction of suppression of evidence is an appropriate one to use in certain cases of violation of ORS 133.565(3). I say "certain" cases because, as I view it, the statutory, rather than constitutional, nature of the duty imposed here leaves the courts free to limit the instances in which the sanction of suppression is imposed to those in which the full range of the statutory purposes have been violated. *See State v. Valentine/Darroch, supra.* I turn to a consideration of this final question.

In the case before us the warrant was served shortly after 10 p.m., the statutory cutoff time between day and nighttime searches; it was not executed during the small hours of the night. The defendant was in custody, and it is not clear if the police knew that someone might be present at the house. However, the state acknowledged to the trial court at the omnibus hearing (and the evidence at trial showed) that defendant's girlfriend, who lived with the defendant, was present at the time of the search. Because the house was not unoccupied or abandoned, the search at night was significant. It invaded, without proper authorization, an occupant's privacy in the nighttime. The possibility of a violent response existed. Under these circumstances, where the statute is an elaboration of constitutional principles and where those principles have been violated, suppression is the only way to vindicate the statutory policy.

We have previously held that a related statute should be enforced by the sanction of suppression. In *State v. Weaver*, 41 Or App 201, 598 P2d 308 (1979), police officers had sought a warrant to search certain premises for cocaine when they also expected to find marijuana. They

had not disclosed to the magistrate their expectation concerning the marijuana, which was subsequently discovered and seized during the search. The defendant in *Weaver* moved to suppress the marijuana as having been seized in violation of ORS 133.585, the statute governing the scope of searches pursuant to a warrant, which provides, in pertinent part:

> "* * * If in the course of the search the officer discovers things, not specified in the warrant, which he has probable cause to believe to be subject to seizure under ORS 133.535 *which he did not have probable cause to expect to find,* he shall also take possession of the things discovered." (Emphasis supplied.)

In spite of the fact that no *constitutional* issue was involved, the trial court suppressed the marijuana and, on appeal, this court affirmed. What we said there applied just as fully here:

> "If evidence seized in violation of ORS 133.585 is not, for that reason, inadmissible, then there is presently no practical means of enforcing the rules stated in [the statute]. * * *"

*Weaver* is in point here, yet the majority has not even seen fit to discuss it.

There have been other occasions when Oregon appellate courts have suppressed evidence because of a statutory violation. *See State v. Fogle,* 254 Or 268, 459 P2d 873 (1969) (lack of statutory certification of equipment requires suppression of breath test); *State v. Valdez,* 277 Or 621, 561 P2d 1006 (1977) (violation of "stop" statute required suppression of resulting evidence). The rationale of these cases—that some statutory violations require suppression of evidence obtained by means of the violation—applies with equal (or even greater) force here. Defendant's motion to suppress should have been granted.

The majority's reliance on *United States v. Searp,* 586 F2d 1117 (6th Cir 1978) is misplaced. As even the material quoted by the majority from that opinion shows, the court there considered suppression an appropriate sanction under certain circumstances. That is all I urge here— not suppression in every case, but suppression where violation of the statute leads to the invasion of interests the

statute was intended to protect. *State v. Weaver, supra; see also, State v. Broadway,* 599 SW2d 721 (Ark 1980).

It is not our function to substitute our own policy judgments for those of the legislature. We all agree on that principle in the abstract but sometimes unintentionally depart from it in practice. I suggest, most respectfully, that the majority has done that here. We agree on what the statute requires.[1] The statute recognizes that nighttime searches are onerous and potentially dangerous. The statute contemplates that, before such a search can occur, (1) the judge will be asked for permission to search at night, (2) the judge will consider the nature of the search requested in light of what is sought and the other circumstances surrounding the case, and (3) the judge will authorize the search at night only where the facts warrant this sort of intrusion. However, this legislative purpose is totally thwarted unless the failure to go through the steps just outlined has a *consequence.*

Suppose a search is conducted at night when (1) it was not even asked for, but the judge signed a printed endorsement on the warrant, or (2) the search is for the life-sized statue of an elephant, or (3) the judge authorizes it "because it is Thursday?" The majority sees no problem; I do: I see a protection the legislature gave our citizens diminished or altogether destroyed. I have higher regard than that for legislative purpose.[2] Where, as in this case—and as the majority repeatedly acknowledges—there was no need for this nighttime search, I would suppress the evidence it produced.

I dissent.

---

[1] That is, most of us do. The specially concurring opinion of Buttler, J., takes a different view which purports to avoid the entire problem. It does so, however, only by ignoring the fact that this statute was intended to be an "important innovation." The only innovation which would result from the specially concurring opinion is the presence of two signatures on a warrant, instead of one. There is no justification for turning this statute into a nullity.

[2] The specially concurring opinion takes the balance of this court to task for what that opinion views as 'legislating' with respect to the statute under the rubric of determining legislative purpose. The opinion's conception of the functions of the legislative and executive branches of government is refreshingly accurate, given its utter disregard for the *judicial* role as the interpreter of law.

Roberts, Warren and Young, Judges, join in this dissent.